**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 24-cv-00001-GPG-STV

NATIONAL ASSOCIATION FOR GUN RIGHTS,
CHRISTOPHER JAMES HIESTAND, RICHARDSON MAX, EDWIN SCHLOSSER, JOHN MARK HOWARD, and ROCKY MOUNTAIN GUN OWNERS,

    Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado,

    Defendant.

---

**THE GOVERNOR'S OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY INJUNCTION [DOC. NO. 8]**

---

Under federal law, firearms sold in the United States must bear a serial number. Law enforcement uses these numbers to trace firearms used in crimes to the point of sale. But a dangerous loophole has emerged in recent years. Until recently, unassembled firearm parts have not been subject to the serialization requirement, even though the parts are often purchased as part of a kit that can be easily assembled at home.

The use of these untraceable "ghost guns" in crimes has spiked in recent years, creating challenges for law enforcement and undermining public safety. In response, Colorado last year passed Senate Bill 23-279 (SB 23-279 or the "Act"), which makes it unlawful to possess or transport certain firearm components that are not imprinted with a serial number. Plaintiffs seek a preliminary injunction against the enforcement of the Act, arguing that it violates their Second Amendment right to "keep and bear Arms." But the Act

1

does not prohibit the use or possession of any firearm, or even any firearm part. Instead, it merely requires anyone possessing an unserialized firearm part to obtain a serialization. The Act therefore does not interfere with the Plaintiffs' Second Amendment right to "keep and bear Arms"—they can keep and bear any arm they want, so long as they obtain a serial number. And even if the Act did implicate their Second Amendment rights, it is consistent with the nation's history and tradition of regulating self-made arms and firearm components. Plaintiffs' motion for preliminary injunction should therefore be denied.

## BACKGROUND

"In the mid-19th century, major arms manufacturers began stamping serial numbers on firearms." Resp. Appx., DeLay Dec., p. 6, ¶ 6. States found these useful in investigating crimes and "began incorporating these numbers into firearms law in the early twentieth century." *Id.* In 1934, the federal government started requiring particularly dangerous firearms (such as fully automatic weapons and sawed-off shotguns) to bear a "manufacturer's number," which was expanded in 1958 to require serial numbering for nearly all new firearms. Resp. Appx., Spitzer Dec.; pp. 74-75, ¶ 18. Serialization does not affect a firearm's functionality." *Id.*, p. 75, ¶ 11.

The law did not require hobbyists who made their own firearms to serialize them. Resp. Appx., DeLay Dec., pp. 6-7, ¶ 7. But this exception has created serious consequences, as technological changes over the last fifteen years have led to the proliferation of gun kits and 3D-printed firearms, which allow for easy-to-assemble firearms that are not subject to serialization requirements or background checks. *Id.*, pp. 6-8, ¶¶ 7-9. The last decade has seen a dramatic increase in the use of ghost guns to commit crimes. Between 2017 and 2021, the U.S. Bureau of Alcohol, Tobacco, Firearms, and

2

Explosives (ATF) reported a 1000% increase in ghost guns recovered by law enforcement, a number that undoubtedly undercounts the actual use of such firearms in crimes. Resp. Appx., Webster Dec., pp. 294-296, ¶ 7. According to one study, ghost guns may now account for as many as one out of every four firearms used in a violent crime, despite representing a much smaller share of the overall firearms market. *Id.*, pp. 296-297, ¶ 8.

In response, Colorado enacted SB 23-279, which makes it unlawful to "knowingly possess, purchase, transport, or receive a firearm or frame or receiver of a firearm that is not imprinted with a serial number." Colo. Rev. Stat. § 18-12-111.5(3)(a). The Act authorizes firearm dealers (also known as federal firearms licensees) to serialize a frame or receiver. *Id.* § 18-12-111.5(7)(a). ATF has also promulgated a regulation in response to the public safety risk posed by ghost guns, requiring serialization for ghost guns and frames and receivers. *See Definition of "Frame or Receiver" and Identification of Firearms*, 87 Fed. Reg. 24652 (Apr. 26, 2022). That regulation is currently being challenged under the Administrative Procedures Act (but not under the Second Amendment). *See VanDerStok v. Garland*, 86 F.4th 179 (5th Cir. 2023), *cert. filed* Feb. 7, 2024.

Plaintiffs sued the Governor and moved for a preliminary injunction against the law, arguing that it violates their rights under the Second Amendment. Mot., Doc 8, at 3.[1]

---

[1] The Governor, sued here in his official capacity, enjoys 11th Amendment immunity from any claims for prospective relief because he does not "have a particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty." *Peterson v. Martinez*, 707 F.3d 1197, 1205 (10th Cir. 2013) (quotations omitted); *see also Ex parte Young*, 209 U.S. 123, 157 (1908). However, for the purpose of defending the Act from Plaintiffs' claims for declaratory and injunctive relief, the Governor agrees to waive his sovereign immunity and consents to be sued in this Court, only in this case, only in his official capacity, and only for prospective relief. *See MCI Telecomms. Corp. v. Pub. Serv. Comm'n of Utah*, 216 F.3d 929, 935 (10th Cir. 2000) ("[A] state may waive its sovereign immunity by consenting to suit in federal court.").

3

**LEGAL STANDARD**

A preliminary injunction is an "extraordinary remedy" for which "the right to relief must be clear and unequivocal." *Schrier v. University of Colorado,* 427 F.3d 1253, 1258 (10th 2005) (quoting *SCFC ILC, Inc. v. Visa USA, Inc.,* 936 F.2d 1096, 1098 (10th Cir. 1991)). The factors for a preliminary injunction are: "(1) a substantial likelihood of success on the merits, (2) that the plaintiff will suffer irreparable injury if the preliminary injunction is denied, (3) that the threatened injury to the plaintiff outweighs the injury to the defendant(s) caused by the preliminary injunction, and (4) that an injunction is not adverse to the public interest." *Aid for Women v. Foulston,* 441 F.3d 1101, 1115 (10th Cir. 2006).

"[P]reliminary injunctions that alter the status quo" are "disfavored" in the Tenth Circuit and so require a heightened showing. *Fund. Church of Jesus Christ of Latter-Day Saints v. Horne,* 698 F.3d 1295, 1301 (10th Cir. 2012). Here, Plaintiffs seek to alter the status quo by enjoining a Colorado law. Therefore, Plaintiffs "must 'make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of the harms.'" *Fish v. Kobach,* 840 F.3d 710, 724 (10th Cir. 2016) (quotations omitted).

**ARGUMENT**

**I.     Plaintiffs are unlikely to succeed on the merits.**

Plaintiffs lack standing to bring the present action and so are unlikely to succeed on the merits. And even if they had standing, they are unlikely to succeed on the merits because the proscribed conduct is not covered by the plain text of the Second Amendment, and § 18-12-111.5 is consistent with the Nation's historical tradition of firearms regulation.

### A. Plaintiffs do not have Article III standing.

Standing is jurisdictional. *See Colo. Envtl. Coalition v. Wenker,* 353 F.3d 1221, 1227 (10th Cir. 2004). Accordingly, "plaintiffs bear the burden of establishing standing." *Colo. Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 544 (10th Cir. 2016).

For Article III standing, a plaintiff must demonstrate, among other things, "an injury in fact . . . which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992) (citations omitted). "A 'concrete' injury must . . . actually exist." *Spokeo, Inc. v. Robins,* 578 U.S. 330, 340 (2016). Accordingly, plaintiffs' injuries must be "real, and not abstract." *Id.*

None of the Plaintiffs can establish standing. In their identical declarations, each individual Plaintiff alleges that they have purchased and assembled firearms from firearm kits in the past, that they "desire to continue purchasing firearms parts kits and assembling them into firearms free of the unconstitutional burden on this conduct imposed by C.R.S. § 18-12-111.5, and but for that statute, [they] would in fact continue to do so." *See e.g.* Howard Dec., Doc. 8-2, ¶ 2; Richardson Dec., Doc. 8-4, ¶ 2; Schlosser Dec., Doc. 8-5, p.1. But the Act doesn't prevent any of the Plaintiffs from purchasing kits and assembling firearms. The Act only requires that Plaintiffs obtain a serialization from a federal firearm licensee. Plaintiffs thus have not pointed to an injury that "actually exist[s]" because the statute does not proscribe their proposed conduct. *Spokeo*, 578 U.S. at 340.

NAGR and RMGO also lack standing. They assert standing based on the interests of certain of their members, which they represent. *See* Rhodes Dec., Doc. 8-3, ¶¶ 3 & 4. For those members, NAGR and RMGO identify the same supposed injury: their members' "desire to exercise their Second Amendment right to acquire firearm parts kits and

5

assemble personally made firearms free of the unconstitutional burden on that conduct imposed by C.R.S. § 18-12-111.5." *Id.* Because the statute does not prevent them from acquiring and assembling firearms from firearm part kits, they have identified no actual injury caused by the statute. Plaintiffs therefore lack standing and are not entitled to the extraordinary remedy of a preliminary injunction.

### B. SB 23-279 is constitutional.

Even if Plaintiffs have standing, they are unlikely to succeed on the merits of their challenge because the Act is constitutional. The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Supreme Court has held "that the Second Amendment conferred an individual right to keep and bear arms." *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008). But "[o]f course[,] the right [is] not unlimited." *Id.* "Properly interpreted, the Second Amendment allows a 'variety' of gun regulations." *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1, 80 (2022) (Kavanaugh, J. concurring). For example, states may regulate certain "dangerous and unusual" arms. *Heller*, 554 U.S. at 622-24, 627. And states can impose reasonable regulations based on unique factors present in their jurisdictions. *McDonald v. City of Chicago*, 561 U.S. 742, 785 ("[S]tate and local experimentation with reasonable firearms regulations will continue under the Second Amendment.")

The Court has established a two-step framework to resolve Second Amendment challenges. First, the Court considers whether "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 597 U.S. at 17. If it does, the Second Amendment "presumptively protects that conduct." *Id.* The burden then falls on the government to

"justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130.

1. **Plaintiffs cannot satisfy the first step of the *Bruen* test because the plain text of the Second Amendment does not cover Plaintiff's proposed conduct.**[2]

The plain text of the Second Amendment does not include a right to assemble unserialized firearms from a purchased firearms kit. The Second Amendment protects "an individual right to keep and bear arms." *Heller*, 554 U.S. at 595. Colorado's ghost gun statute does not implicate this right. First, the statute does not infringe Plaintiffs' right to "bear Arms." That phrase "has a meaning that refers to carrying for a particular purpose—confrontation." *Heller*, 554 U.S. at 584; *see also Bruen*, 597 U.S. at 32 (holding the word "'bear' naturally encompasses public carry"). Second, the statute also does not infringe Plaintiffs' right to "keep Arms." Historically, "'[k]eep arms' was simply a common way of referring to possessing arms[.]" *Heller*, 554 U.S. at 583. Unlike the laws at issue in *Heller* and *McDonald*, which precluded individuals from keeping handguns in their homes, *this statute does not make possession of any firearm illegal*. The statute does not prohibit Plaintiffs from possessing any particular arm or category of arms. Instead, the statute simply requires that, if an individual possesses a firearm or firearm component without a serialized number, then they must get a serialization affixed. *See* Colo. Rev. Stat. § 18-12-111.5. The individual's right to keep their Arms is unimpeded.

---

[2] The *Bruen* Court did not expressly allocate the burden for determining whether the Second Amendment's plain text covers an individual's conduct. 597 U.S. at 17. Accordingly, the "default rule" prevails, in which Plaintiffs "bear the risk of failing to prove their claims." *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56 (2005). Most courts have lodged *Bruen*'s initial burden with civil plaintiffs. *See, e.g., Rocky Mountain Gun Owners v. Polis*, No. 23-cv-01077-PAB, 2023 WL 5017253, at *10 (D. Colo. Aug. 7, 2023).

Relatedly, "individual self-defense is 'the central component' of the Second Amendment." *McDonald*, 561 U.S. at 767 (quoting *Heller*, 554 U.S. at 599). Requiring a serial number on firearms and firearm parts does not interfere with an individual's ability to defend themself. Accordingly, even if, as Plaintiffs contend, "gunsmithing was a . . . hobby" in early America, Mot. at 1, minor regulations of that hobby—such as affixing a serial number—have no bearing on the Second Amendment's central concern of self-defense. *See Planned Parenthood of SE Penn. v. Casey*, 505 U.S. 833, 988 (1992) (Scalia, J., concurring) ("[A] law of general applicability which places only an incidental burden on a fundamental right does not infringe that right.").

Plaintiffs implicitly concede that their desired conduct—to possess unserialized frames and receivers—is not within the plain text of the Second Amendment. Instead, Plaintiffs argue that "the right to keep and bear arms *implies* a right to manufacture arms." Mot. at 8 (emphasis added). This implied-rights argument is contrary to *Bruen* and *Heller*. The Court there was clear: courts must determine whether "the Second Amendment's *plain text* covers an individual's conduct." *Bruen*, 597 U.S. at 17 (emphasis added). Plaintiffs' focus on implied rights necessarily disregards the actual text of the Second Amendment. *See, e.g.*, *id.* at 20 ("In *Heller*, we began with a 'textual analysis' focused on the 'normal and ordinary' meaning of the Second Amendment's language.") (quoting *Heller*, 554 U.S. at 576-77). Accordingly, Plaintiffs' argument that the Second Amendment "implicitly includes the right to . . . manufacture firearms . . . is quite-clearly not a 'plain text' analysis, required under *Bruen*." *Def. Distributed v. Bonta*, No. CV 22-6200-GW-AGRx, 2022 WL 15524977, at *4 (C.D. Cal. Oct. 21, 2022). Here, by labeling the so-called "right

8

to manufacture" firearms an "implie[d] right," Plaintiffs concede that the right is not found in the plain text of the Second Amendment. This dooms their claim under *Bruen*.

Plaintiffs cite *Rigby v. Jennings*, 630 F. Supp. 3d 602 (D. Del. 2022), which invalidated a Delaware statute that prohibited the possession of unfinished frames and receivers and untraceable firearms. But *Rigby* actually supports the Governor's position. The *Rigby* court determined that the Delaware statute implicated the Second Amendment at *Bruen*'s first step because it "criminalize[d] the possession of unserialized finished firearm frames and untraceable firearms **without providing any way for Plaintiffs to keep firearms they lawfully manufactured**." *Id.* at 613 (emphasis added). The court was careful to distinguish Delaware's restrictive statute from California's ghost gun statute, which "permits individuals to 'apply to the Department of Justice for a unique serial number or other mark of identification' for their firearms." *Id.* at 613 n.12 (quoting Cal. Penal Code § 29180(b)(1)). "Unlike California," the *Rigby* court noted, "Delaware is criminalizing the possession of once-lawfully possessed firearms without giving Plaintiffs any opportunity to maintain possession of their firearms by applying for a serial number." *Id.*

Colorado's statute is like the California statute approved of by *Rigby*. The Act allows a federal firearms licensee to serialize any frame, receiver, or firearm. *See* Colo. Rev. Stat. § 18-12-111.5(7). Unlike Delaware's statute, Colorado does not criminalize the possession of anyone's firearm. Therefore, Colorado's statute does not prohibit the possession of firearms, firearm parts, or gun assembly kits and so does not burden rights protected by the Second Amendment in the manner identified by the *Rigby* court.

Other courts have expressly found that the Second Amendment right to "keep and bear Arms" does not extend to private assembly of firearm parts. For instance, in *Defense*

9

*Distributed v. Bonta,* the court held that a statute prohibiting the use, possession, selling, or transfer of a milling machine used to manufacture firearms is not covered by the text of the Second Amendment. 2022 WL 15524977, at *1, *4. "What is at issue here is a ban on 'self-manufacture of firearms' and a prohibition on 'the sale of the tools and parts necessary to complete the self-manufacturing process.'. . . [Y]ou will not find a discussion of these concerns (or any such 'right(s)') in the 'plain text' of the Second Amendment." *Id.* at *4. Put simply, the legislation focused on firearm manufacturing and had "nothing to do with 'keep[ing]' or 'bear[ing]' arms." *Id.*

And in *United States v. Avila,* a Colorado district court upheld a similar federal statute prohibiting the possession of any firearm with an obliterated serial number. No. 22-cr-2240WJM-1, 2023 WL 3305934, at *5 (D. Colo. May 8, 2023). Conducting the textual analysis required by *Bruen*, the court found that the Second Amendment did not protect an individual's right to possess a firearm with an obliterated serial number. *Id.* at *5. Plaintiffs argue that *Avila* is distinguishable from this case because the federal statute only applies to obliterating serial numbers on commercially manufactured firearms, not parts. Mot., Doc. 8., at 9-10. This is a distinction without a difference. Similar to ghost guns, which are manufactured without a serial number, obliterating a serial number "mak[es] the identity of a person who possesses a particular firearm more difficult to determine." *Avila*, 2023 WL 3305934, at *5. Such arms may be regulated consistent with the Second Amendment.

2. **Colorado's statute is consistent with the Nation's history and tradition of firearm regulation.**

Even if unserialized frames or receivers obtained in firearm assembly kits falls within the plain text of the Second Amendment, Plaintiffs are unlikely to succeed on the merits because Colorado's statute fits within "the Nation's historical tradition of firearm

10

regulation." *Bruen,* 597 U.S. at 24. To meet its burden at this stage, the government does not need to identify a historic law that is a "dead ringer." *Id*. at 30. Due to "unprecedented societal concerns" and "dramatic technological changes," "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id.* at 27. Instead, the Governor must demonstrate only that the Act has "a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 30.

American history demonstrates a long tradition of regulating self-assembled firearms, as well as regulating firearm components. In colonial and early republic times, many colonies and states regulated trap guns, a type of self-assembled firearm that could fire without a human present by use of a tripwire. Resp. Appx., Spitzer Dec., pp. 75-76, ¶¶ 20-21; pp. 77-79, ¶ 24. Sixteen such laws were enacted in the 1700s-1800s—with the earliest in 1771—and 13 in the early 1900s. *Id.* at pp. 77-79, ¶ 24. Additionally, gunpowder was "widely and extensively regulated in the colonies and states" given the threat posed to public safety by poorly-stored gunpowder. *Id.* at pp. 83-83, ¶¶ 33-34. Regulation of gunpowder—obviously a necessary element of a functional firearm—took many forms, including requiring a license for possessing certain amounts of gunpower. *Id.* at p. 83, ¶ 33; p. 88, ¶ 41. At least six colonies in the 1600s and eight colonies in the 1700s enacted laws regulating this critical firearm component. *Id.* at pp. 84-85, 87; ¶¶ 35-36, 39. After the Second Amendment was enacted, these gunpowder laws were not challenged in court. *Id.* at pp. 89-90, ¶ 44. To the contrary, more states and cities enacted more gunpowder laws.

And even though self-manufactured firearms were rare in early America, another form of arms were both self-made and subject to government regulation: clubs and other

11

blunt weapons. *See Heller*, 554 U.S. at 581 (defining 18th century "arms" as "weapons of offense," or "any thing that a man . . . takes into his hands, or useth in wrath to cast at or strike another") (citing historical dictionaries). Unlike firearms, clubs were generally easy to make in early America. Resp. Appx., Spitzer Dec., p. 75, ¶ 19; p. 101, ¶ 59. Bludgeons—a short stick with a weighted end—were barred by 15 states as early as 1799. *Id.,* ¶ 60. Sixteen states barred billy clubs dating to 1862. And 13 other states have generally barred the carrying of "clubs," dating back to 1664. *Id.*, p. 104, ¶ 62. Thus, contrary to Plaintiffs, self-manufactured arms are not immune from government regulation.

      Plaintiff argues "there is no Founding-era law analogous to a modern law requiring the serialization of firearm parts." Mot., Doc 8, at 10. But the Governor need not show a historical twin, only a historical analogue. *See Bruen*, 597 U.S. at 30. Regulations of self-assembled arms and firearm components, enacted to further public safety, show that the Second Amendment never protected an unfettered right to assemble firearms free of government oversight. Nor is the lack of Founding-era serialization requirements surprising. In a pre-industrial society such as Colonial America, "where guns and gun parts . . . were mostly imported from abroad . . . , there would be no reason, notion, ability, or incentive to enact some kind of uniform firearm numbering system." Resp. Appx., Spitzer dec., pp. 72-73, ¶¶ 13-15. Nor did early America have the technical capacity to implement uniform serialization, with its slow communications and decentralized recordkeeping. *Id.* Policing itself "barely existed in the way we think of policing today." *Id.*, p. 100, ¶ 57. In short, "in the 1700s and most of the 1800s, uniform firearms serializing was a non-existent solution to a non-existent problem." *Id.*, p. 73, ¶ 15.

Plaintiffs argue that a tradition of individuals self-producing firearms predates the Revolutionary War. Mot., Doc. 8, at 8. Not so. By the time of the American Revolution, the vast majority of manufactured firearms were from England, Belgium, Spain and France. Resp. Appx., DeLay, Dec., p. 20, ¶ 30. The overwhelming majority of firearms found in Colonial America originated from these European production centers that offered economies of scale, access to high-quality materials, and technologically sophisticated production. *Id*., pp. 20-22, ¶¶ 30-33. In contrast, 18th century Colonial America had a minor, low-productivity firearms manufacturing sector. *Id*., pp. 29-30, ¶ 47. The majority of gunsmiths in Colonial America were focused on making minor repairs to firearms, not manufacturing them. *Id*., pp. 23-24, ¶ 36; *id*., pp. 25-26, ¶¶ 40-41. While there was a smaller sector of gunsmiths that produced firearms, these gunsmiths usually relied on imported locks and other imported components. *Id*., p. 27, ¶ 43. Furthermore, such production was not the work of amateur or moonlighting gunsmiths, but skilled and well-compensated professionals. *Id*. The outbreak of the Revolutionary War did not change these circumstances. Most American forces fought with imported European firearms; American war planners relied not upon a tradition of self-made arms but Colonial government policies and international markets. *Id*., pp. 38-40, ¶¶ 61-62. Therefore, the notion that there is an historical tradition of self-manufacturing guns dating back to the Revolutionary War is inaccurate.

Furthermore, Plaintiffs' conduct is unlike the limited self-manufacturing of arms that did occur in 18th century America. Plaintiffs mischaracterize ghost guns as "manufactured arms," but ghost gun kits do not require any firearm manufacturing expertise. Resp. Appx., DeLay Dec., pp. 10-11, ¶¶ 14-15. Instead, these kits are marketed to amateurs looking for

13

easy assembly. For instance, one seller of ghost gun kits promises its buyers that its "patented AR-15 and .308 Easy Jigs … mak[e] It ridiculously easy for a non-machinist to finish their 80% lower in under 1 hour with no drill press required." *Id*., pp. 10-11, ¶ 14. In short, these ghost gun "kits enable consumers with no skill, experience, or special tools to quickly assemble high-quality firearms. Nothing like that has ever existed before in American life." *Id.*, p. 45, ¶ 70.

## II. Plaintiffs' claims also fail to satisfy the remaining elements for injunctive relief.

### A. Plaintiffs will not suffer irreparable harm absent a preliminary injunction.

Irreparable harm has been characterized as the "single most important prerequisite for the issuance of a preliminary injunction." *Schrier,* 427 F.3d at 1268 (citation omitted). The alleged injury must be "certain, great, actual 'and not theoretical.'" *Heideman v. S. Salt Lake City,* 348 F.3d 1182, 1189 (10th Cir. 2003) (quoting *Wis. Gas. Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). Here, Plaintiffs have not demonstrated how requiring serial numbers to be imprinted on frames or receivers by federal firearms licensees causes them irreparable harm. For instance, Plaintiffs all make the conclusory assertion that Colorado's statute presents them with an "unconstitutional burden." *Eg.* Howard Dec., Doc. 8-2, ¶2; Schlosser Dec., Doc. 8-5, p. 1. But Plaintiffs can still purchase kits and assemble firearms; they just need to have serial numbers imprinted on the frames or receivers. Therefore, because they can keep and bear any arm—or part—that they wish, they cannot satisfy the requirement of showing irreparable harm.

### B. The balance of harms and public interest factors support entry of injunctive relief.

14

The last two factors, the balance of equities and the public interest, "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). These factors strongly weigh in Colorado's favor. For one, Colorado's elected officials "are in a better position than this Court to determine the public interest." Fish, 840 F.3d at 755.

The Act also advances important public safety concerns. It was passed because "unserialized firearms skirt, or go around [Colorado's] background check systems. I think that is the number one improvement in safety . . . ." *Hearing on SB23-279 Before the S. State, Veterans & Mil. Comm.,* 2023 Leg., 74th Sess. (Co. 2023) (statement of Sen. Chris Hansen, Member, S. State, Veterans, & Mil. Affairs Comm.) (audio available at http://tinyurl.com/mr4axntm)at 2:37:43 - 2:37:56. Colorado District Attorneys testified in support of the bill. "Without a serial number, it's easier for guns to fall into the wrong hand." *Id.* (statement of Denver Dist. Att'y Beth McCann) at 3:01:00 - 3:01:05. Another added that ghost guns are "designed from the very start so that it's off the radar of law enforcement, and off the radar for any criminal investigation and prosecution of violent offenses." *Id.* (statement of Boulder Cnty. Dist. Att'y Michael Dougherty) at 2:59:23 - 3:00:10.

The Colorado Association of the Chiefs of Police testified similarly. "Ghost guns are seen frequently by police investigating crimes around the state of Colorado. Ghost guns present unique challenges to law enforcement when it comes to tracking weapons previously used in crimes, owned by offenders, or transferred illegally." *Id.* (statement of Chief Brent Newbanks) at 3:21:57 – 3:22:14.

**CONCLUSION**

For the foregoing reasons, Plaintiffs' motion should be denied.

Respectfully submitted this 28th day of February, 2024.

        PHILIP J. WEISER
        Attorney General

        */s/  Michael Kotlarczyk*
        Michael T. Kotlarczyk, No. 43250*
        Kathleen L. Spalding, Reg. No. 11886*
        Patrick L. Sayas, Reg. No. 29672*
        Senior Assistant Attorneys General
        Samuel Wolter, Reg. No. 59265*
        Assistant Attorney General Fellow
        Colorado Attorney General's Office
        1300 Broadway, 10th Floor Denver, CO 80203
        Telephone:  720.508.6634, -6633, -6187, -6182
        Email: kit.spalding@coag.gov
            Pat.Sayas@coag.gov
            mike.kotlarczyk@coag.gov
            Samuel.Wolter@coag.gov
        *Attorneys for Defendant Jared S. Polis, in his official capacity as the Governor of the State of Colorado*

*Counsel of Record