IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

**Civil Action No. 24-cv-00001-GPG-STV**

NATIONAL ASSOCIATION FOR GUN RIGHTS
CHRISTOPHER JAMES HIESTAND RICHARDSON,
MAX EDWIN SCHLOSSER
JOHN MARK HOWARD, and
ROCKY MOUNTAIN GUN OWNERS

    Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado

    Defendant.

---

**REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

---

**I.     Dr. Webster's Declaration Should be Stricken from the Record**

From the first paragraph of its Response Brief ("Resp."), the State argued that C.R.S. § 18-12-111.5 (the "Statute") promotes important policy goals. The State attached the Declaration of Bloomberg Professor Daniel Webster in support of these policy arguments. Plaintiffs object to Dr. Webster's declaration and request the Court to strike it from the record on the ground that the public policy opinions he expresses are irrelevant.

Dr. Webster holds a doctorate in health policy. Webster Dec. ¶ 3. He states that he is providing opinions on the following: "current research relevant to unserialized, privately-made firearms (PMFs) use in crime and how the growing availability of PMFs affects both the criminal acquisition of and use of firearms to commit violent crime and gun trafficking to supply individuals in the underground gun market." *Id.* ¶ 2. The State's public policy expert's opinions are irrelevant to the Court's resolution of Plaintiffs' Second Amendment challenge. Indeed, *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), specifically held that opinions on policy such as those expressed by Dr. Webster are out of bounds. The Court wrote:

> To justify its regulation, *the government may not simply posit that the regulation promotes an important interest*. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. *Only if a firearm regulation is consistent with this Nation's historical tradition* may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.

597 U.S. at 17 (internal citation and quotation marks omitted; emphasis added).

*Bruen* made policy arguments off limits in Second Amendment cases, and the State's public policy expert's opinions simply have nothing to do with the issues before

1

the Court, i.e., whether the Second Amendment's plain text covers Plaintiffs' conduct or whether the Statute is consistent with the Nation's historical tradition of firearm regulation. "Irrelevant evidence is not admissible." Fed. R. Evid. 402.

## II.     Plaintiffs Seek to Preserve the Status Quo

The State correctly notes that the goal of a preliminary injunction is to preserve the status quo pending trial. *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009). But the State is wrong when it suggests that Plaintiffs are under a heighted standard because they seek to disrupt the status quo. The "status quo" is the last uncontested status between the parties before the dispute arose. In the context of a newly enacted law, the last peaceable uncontested status was the status existing before the government enacted the challenged law. *Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 798 n.3 (10th Cir. 2019); *see also Springer v. Grisham*, 2023 WL 8436312, *3 (D.N.M. Dec. 5, 2023) (*Free the Nipple* rule applied in Second Amendment challenge). The Statute is a newly enacted law, and Plaintiffs brought their challenge on the day the law became effective. Thus, the rule in *Free the Nipple-Fort Collins* is applicable. Plaintiffs are attempting to preserve, not disrupt, the status quo.

## III.    Plaintiffs Have Standing

To establish standing a plaintiff must show three elements: (1) he has suffered an "injury in fact"; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely that the injury will be redressed by a favorable decision. *N. New Mexico Stockman's Ass'n v. United States Fish & Wildlife Serv.*, 30 F.4th 1210,

1219 (10th Cir. 2022) (internal citations and quotation marks omitted). The State challenges Plaintiffs' standing only on the first element (i.e., injury in fact).

A plaintiff can establish injury sufficient to bring a constitutional challenge to a law by (1) showing an intention to engage in a course of conduct that is (2) arguably affected with a constitutional interest, but is (3) proscribed by statute, and (4) there exists a credible threat of prosecution thereunder. *Peck v. McCann*, 43 F.4th 1116, 1129 (10th Cir. 2022) (internal citation and quotation marks omitted).

The State does *not* argue that Plaintiffs will not purchase firearms parts kits and assemble them into firearms. Resp. 5. Nor does the State argue that such conduct is not arguably affected with a constitutional interest. The State does not argue that there is no credible threat of prosecution if Plaintiffs were to violate the Statute. The State's sole argument on standing is as follows: "But the Act doesn't prevent any of the Plaintiffs from purchasing kits and assembling firearms. The Act only requires that Plaintiffs obtain a serialization from a federal firearm licensee. Plaintiffs thus have not pointed to an injury that 'actually exist[s]' because the statute does not proscribe their proposed conduct. Resp. 5. In other words, the State's sole standing objection is based on element (3) of the injury-in-fact analysis. It claims Plaintiffs' proposed conduct is not proscribed by the Statute.

The State's argument is meritless. Each of the individual Plaintiffs stated that their proposed conduct was to "continue purchasing firearms parts kits and assembling them into firearms free of the unconstitutional burden on this conduct imposed by C.R.S. § 18-12-111.5, and but for that statute, [they] would in fact

3

continue to do so." *See e.g.* Howard Dec., Doc. 8-2, ¶ 2; Richardson Dec., Doc. 8-4, ¶ 2; Schlosser Dec., Doc. 8-5, p.1. And the unconstitutional burden to which they refer is forcing them to imprint serial numbers on their privately made firearms and prohibiting them from making frames and receivers. Mot. 10. Thus, Plaintiffs' proposed conduct is proscribed by the State.

Plaintiffs will introduce additional evidence regarding their injury at the hearing on their motion. In particular, one or more of the Plaintiffs will testify that they possessed an unserialized handgun in Colorado and that because of the Statute, they took steps to dispossess that weapon in Colorado. It should go without saying that a Plaintiff has standing to bring a Second Amendment claim when the State has forced him to give up possession of a Second Amendment protected handgun.

## IV. The Plain Text Covers Plaintiffs' Proposed Conduct

The Statute makes it illegal to possess unserialized handguns. C.R.S. § 18-12-111.5(3)(a). The evidence at the hearing will show that Plaintiffs desire to possess (i.e., "keep") unserialized handguns they have made themselves. The plain text of the Second Amendment protects the right to "keep" handguns. *D.C. v. Heller*, 554 U.S. 570, 628 (2008). Thus, Plaintiffs' proposed conduct is protected by the plain text of the Constitution.

In addition, C.R.S. § 18-12-111.5(5)(a)(I) is a flat ban on manufacturing firearms[1] for the overwhelming majority of people in Colorado. Anyone who is not a

---

[1] Technically, the Statute bans manufacturing frames and receivers, but this is the functional equivalent of banning the manufacture of firearms altogether, because it is impossible to make a firearm without a frame or receiver.

4

federally licensed firearms manufacturer is barred from making guns. This means that as of January 1, 2024, out of a population of 5.8 million people in Colorado, only 632 licensed manufacturers may exercise their right to make guns without fear of criminal prosecution. Plaintiffs desire to produce privately made firearms. The right to keep and bear arms implies a corresponding right to acquire arms. This is most commonly accomplished through purchasing arms, but it can also be accomplished by making arms. The State argues the Second Amendment protects only the right to carry or possess arms a citizen already has and it does not include a right to manufacture arms because the word "manufacture" is not in the text. Resp. 7-8. But common sense dictates that one cannot keep and bear an arm if one has not acquired it in the first place. *See United States v. Alston*, 2023 WL 4758734, *8 (E.D.N.C., Jul 28., 2023) ("As a logical matter, it is impossible to 'keep' or 'bear' arms without first receiving them. If the Second Amendment protects the possession and use of firearms, it must also protect their acquisition – otherwise, the Amendment would protect nothing at all.").

The State insists, however, that no ancillary rights are implied by the Second Amendment *at all*. Resp. 8. This is plainly wrong as a matter of general constitutional law. "Constitutional rights . . . implicitly protect those closely related acts necessary to their exercise." *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring). Thus, the right to keep and bear arms implies a corresponding right to acquire arms and to obtain the bullets necessary to use them. *Id*. "Without protection for these closely related rights, the Second Amendment would be toothless." *Id*. As

5

the Ninth Circuit noted in *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017), the Second Amendment right to keep and bear arms wouldn't mean much without the ability to acquire arms. *See also Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) (right to possess firearms implies a corresponding right to acquire them).

"Similarly, here, the right to keep and bear arms implies a corresponding right to manufacture arms. Indeed, the right to keep and bear arms would be meaningless if no individual or entity could manufacture a firearm." *Rigby v. Jennings*, 630 F. Supp. 3d 602, 615 (D. Del. 2022). *See also Miller v. Bonta*, 2023 WL 6929336, at *6 (S.D. Cal. Oct. 19, 2023) (appeal filed) (right to possess firearm is covered by plain text and therefore it "should go without saying" that right to manufacture is as well); and *Duncan v. Bonta*, 2023 WL 6180472, at *17 (S.D. Cal. Sept. 22, 2023) (appeal filed) (same regarding manufacture of firearm magazine).

The State attempts to distinguish *Rigby* on the ground that the Colorado statute provides a way for the maker of a privately made firearm to obtain a serial number. Resp. 9. This is simply not true. On its face, C.R.S. § 18-12-111.5(5)(a)(I) makes it illegal for anyone who is not a federally licensed firearms manufacturer to make a firearm – period full stop. This is true even if the person intends to have the firearm stamped with a serial number.

Moreover, the State misreads *Rigby's* discussion of serial numbers in the first place. *Rigby* flatly holds that the "[t]he Second Amendment . . . protects the possession of untraceable firearms and unfinished firearms and receivers because its text covers

6

the possession of firearms." It is true that *Rigby* goes on to say that the Delaware statute did not provide a way to obtain serial numbers for citizens who desired to do so. But nothing in the opinion limited the generality of the of the court's holding that the plain text of the Second Amendment covers the right to possess unserialized firearms because the text covers the right to possess firearms. [2]

## V. In the Founding Era Private Gun Making Existed and Was Unregulated

Plaintiffs submit the Declaration of Joseph Greenlee. In addition to re-iterating much of his article that was cited in the motion, Greenlee states that of the 300,000 long arms used in the Revolution, as many as 80,000 were the product of America's scattered gunsmiths using mixed components. Greenlee Dec. ¶ 19. Thus, there can be little question that Americans privately made firearms in the Founding era, and the government was aware of the practice and sometimes encouraged it. Greenlee Dec. ¶ 47. The practice was never regulated, much less prohibited. *Id*. As Jefferson once wrote, "Our citizens have always been free to make, vend, and export arms. It is the constant occupation and livelihood of some of them." *Id*.[3]

## VI. The State's Experts Give Away the Store

Professor Spitzer admits that "[m]eaningful serialization of firearms is a relatively recent phenomenon. Spitzer Dec. ¶ 13. Spitzer also acknowledges the existence of a gun making tradition in the Founding era when he asserts that a

---

[2] The State argues that *United States v. Avila* cannot be distinguished from this case. Resp. 10. But it clearly can for the reasons set forth in the Motion. Mot. 10. Plaintiffs will not repeat those arguments here.
[3] Quoting Letter from Thomas Jefferson to George Hammond (May 15, 1793), in 7 THE WRITINGS OF THOMAS JEFFERSON 326 (Paul Ford ed., 1904)

7

colonial gunsmith might have been able to make two to possibly three muskets a week if some of the more intricate parts such as the lock mechanism were obtained from abroad. Spitzer Dec. ¶ 14. Professor Delay similarly states that Founding-era gunsmiths made firearms with a mix of self-made components and imported locks and barrels. DeLay Dec. ¶ 42.

This testimony is stunning because it practically proves Plaintiffs' case. Both of the State's history experts admit that in the Founding-era European manufacturers played the role that Polymer80, Inc. plays today. In the Founding era the European manufacturers sent components to do-it-yourself gun makers who assembled the components into firearms. Today, Polymer80 sends components to do-it-yourself gun makers who assemble the components into firearms. DeLay all but admits that the Founding-era and modern practices are similar. DeLay Dec. ¶ 44. DeLay tries to downplay the obvious similarities by pointing to the difference in delivery speeds of the components and the work necessary to assemble the components into a firearm. But for all his protests, nothing could be clearer than that the processes he describes are functionally identical. In both cases, a do-it-yourself gun maker receives components from a gun company and assembles them into a firearm.

DeLay makes much of the fact that do-it-yourself gun makers produced firearms on a much smaller scale than the organized manufacturing concerns and that gun making was beyond the ken of the average person. DeLay Dec. ¶¶ 18, 30. No one disputes that during the Founding era, (1) most firearms were produced by

8

gun manufacturing concerns; and (2) only a few people engaged in private gun making. But surely DeLay has missed the point. Indeed, by pointing these things out he has once again highlighted similarities between the Founding era and today. (1) Today, just as in the Founding era most firearms are produced by manufacturing companies. (2) Today, just as in the Founding era, only a few people engage in private gun making.

During the Founding era, individuals engaged in small-scale do-it-yourself firearm making that was functionally equivalent to the private manufacturing Plaintiffs engaged in before Colorado criminalized it. Both of the State's experts admit this. Spitzer Dec. ¶ 14; DeLay Dec. ¶ 47. This is critical to the Court's resolution of Plaintiffs' motion. The State asserts that small scale do-it-yourself gun making from component kits is a problem. But the Founders were well aware of an identical practice and they did not regulate it, much less prohibit it as the State has. Indeed, Professor DeLay admits that far from discouraging small scale private manufacturing, the Founders actively encouraged it with cash incentives. DeLay Dec. ¶ 55.

*Bruen* noted that when a challenged regulation addresses an issue that existed in the 18th century, the lack of a similar historical regulation addressing the issue is evidence that the challenged regulation is unconstitutional. 597 U.S. at 26. Thus, the fact that the Founders could have enacted a regulation identical to the challenged Colorado Statute but chose not to do so means that the Statute is not consistent with

9

the Nation's history and tradition of firearm regulation and is therefore unconstitutional.

### VII. Spitzer's List of Regulations of Trap Guns, Clubs and Knives is Irrelevant

The State points to regulations of gunpowder storage, knives, trap guns and clubs and suggests that those regulations are analogous to the Statute. Resp. 11-13. Here, the State is following a tradition that dates all the way back to *Heller* of spewing a list of random regulations and saying "voilà, analogues." In *Bruen*, the court specifically disapproved this practice. The Court wrote that at a high enough level of generality, everything is infinitely analogous to everything else. 597 U.S. at 29. Therefore, listing random regulations will not do. Instead, the government must demonstrate "relevantly similar" regulations that are similarly justified (the "why" question) and that impose similar burdens (the "how" question). *Id*. The State does not even attempt to comply with *Bruen's* instructions. For example, it refers to laws regulating the public carry of knives and laws requiring the safe storage of gunpowder, but it does not even begin to explain how the "why" and "how" of these laws is similar to the "why" and "how" of the challenged Statute.

*/s/ Barry K. Arrington*
_____
Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033
(303) 205-7870
Email:  barry@arringtonpc.com

## CERTIFICATE OF SERVICE

I hereby certify that on March 8, 2024, I electronically filed a true and correct copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing via email to parties of record.

*/s/ Barry K. Arrington*
_____
Barry K. Arrington