IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Gordon P. Gallagher

Civil Action No. 24-cv-00001-GPG-STV

NATIONAL ASSOCIATION FOR GUN RIGHTS,
CHRISTOPHER JAMES HIESTAND RICHARDSON,
MAX EDWIN SCHLOSSER,
JOHN MARK HOWARD, and
ROCKY MOUNTAIN GUN OWNERS,

      Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado,

      Defendant.

---

# ORDER

---

    Before the Court is Plaintiffs' Motion for Temporary Injunction (D. 8). The Court held an evidentiary hearing on the motion on March 14, 2024. The Court DENIES the motion for the following reasons.

## I. BACKGROUND

    Plaintiffs challenge the constitutionality of Colorado Revised Statute § 18-12-111.5 and seek to enjoin its enforcement.[1] Colorado enacted Senate Bill 23-279 in June 2023, making it unlawful to possess or transport certain firearm components that lack a serial number and that can be assembled into a privately made firearm (PMF), colloquially called a "ghost gun" (D. 1-1).

---

[1] The Court draws the operative background facts predominantly from Plaintiffs' Complaint (D. 1) along with the parties' briefs and supporting exhibits (D. 8, D. 23, D. 26) and the evidentiary hearing held on March 14, 2024 (D. 27, D. 28).

Section 18-12-111.5, which became effective on January 1, 2024, requires an unassembled frame or receiver to be serialized before the effective date and prohibits a person using a three-dimensional printer (3D printer) to manufacture a frame or receiver.[2]  Section 18-12-111.5 provides, inter alia, that:

> A person shall not knowingly possess or transport an unfinished frame or receiver; except that it is not an offense if the unfinished frame or receiver is required by federal law to be imprinted with a serial number and has been imprinted with a serial number by a federal firearms licensee pursuant to federal law or subsection (7) of this section.
>
> [. . .]
>
> A person shall not manufacture or cause to be manufactured, including through the use of a three-dimensional printer, a frame or receiver of a firearm.[3]

Colo. Rev. Stat. § 18-12-111.5(1)(a), (5)(a)(I).  A person who violates subsection (1), (2), (3), (4), or (5)(a) of the Statute commits unlawful conduct involving an unserialized firearm, frame, or receiver. This offense is categorized as a class 1 misdemeanor unless it is a second or subsequent offense, which is a class 5 felony. § 18-12-111.5(6)(a)-(b).  A person does not violate the Statute if they have the PMF, frame, or receiver imprinted with a serial number by a federal firearms

---

[2] Prior to January 1, 2024, a person who owned an unserialized PMF, frame or receiver of a firearm, or 3D printed firearm could have the PMF or the frame or receiver of the firearm imprinted with a serial number by a federal firearms licensee (FFL) who was authorized to provide serialization services.  § 18-12-111.5(5)(b)(I).  Based on the language of the Statute, it appears to this Court that after January 1, 2024, a person is not prohibited from purchasing an unserialized frame or receiver (assuming that federal law does not regulate this), having the firearm part serialized, and then assembling a serialized PMF  *See* § 18-12-111.5(3)(b)(II).  However, after January 1, 2024, it appears from the language of the Statute that a person may not 3D print an unserialized frame or receiver to manufacture a PMF, regardless of whether the person seeks to have the 3D-printed frame or receiver serialized by an FFL at a later date. *See* § 18-12-111.5(5)(a)(I), (b)(I).

[3] The Court is cognizant of the word "including" within the manufacturing clause.  It is possible that this clause could implicate another method of manufacturing or replication that is distinct from 3D printing.  Plaintiffs, however, presented no argument regarding this issue and adduced no evidence regarding whether any Plaintiffs wished to manufacture a firearm from the ground up (via metal fabrication and woodworking) or by any other method.  As will be discussed below, Plaintiffs do not have standing to address subsection (5).  *See* infra note 18.

licensee (FFL) and undergo a background check pursuant to Colorado Revised Statute § 18-12-112.5.  § 18-12-111.5(7)(a), (c).

Plaintiffs' challenge to the Statute can be divided into two distinct issues: (1) the purchase of firearm parts kits for an unfinished frame or receiver without serial numbers from a third party, the assembly of these kits into a PMF, and the possession of the PMF in Colorado sans serialization, and (2) the creation of firearm parts—in particular the frame or receiver—via three-dimensional printing (3D printing), the assembling of these 3D-printed parts into a functioning PMF, and the possession of the PMF in Colorado sans serialization.  Plaintiffs allege that Colorado's ban on the purchase of unserialized firearm parts kits, the prohibition of 3D printing of frames or receivers, and the criminalization of possession of the unserialized PMF (whether assembled by kit or 3D-printed) violates their rights under the Second Amendment of the United States Constitution (*see* D. 1).

Before analyzing § 18-12-111.5 and the instant motion, some background pertaining to *VanDerStok v. Garland*, 86 F.4th 179 (5th Cir. 2023), is necessary to provide context to this Order. In April 2022, the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) issued a Final Rule that defined the terms "firearm" and "frame or receiver" as including partially complete, disassembled, or nonfunctional frames or receivers and weapon parts kits.  Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24652, 24653 (Apr. 26, 2022).  Per the Final Rule, the purpose of the definitions was "to provide direction as to which portion of a weapon is the frame or receiver for purposes of licensing, serialization, and recordkeeping, thereby ensuring that a component necessary for the functioning of the weapon could be traced if later

involved in a crime." *Id.* The Final Rule paid particular focus to PMFs due to the difficulty in tracing ownership of the firearm. *Id.* at 24652.

In 2022, several plaintiffs filed a petition for review in the United States District Court for the Northern District of Texas, arguing that the Final Rule exceeded the ATF's congressionally delegated authority under the Gun Control Act, 18 U.S.C. § 921. The Northern District of Texas ruled in a series of preliminary injunctions that the ATF exceeded its authority beyond the statutory language when defining "frame or receiver" and "firearm" and that a "weapon parts kit is not a firearm." *See VanDerStok v. Garland*, 625 F. Supp. 3d 570, 577-80 (N.D. Tex. 2022), *opinion clarified*, No. 4:22-CV-00691-O, 2022 WL 6081194 (N.D. Tex. Sept. 26, 2022). On November 9, 2023, the U.S. Court of Appeals for the Fifth Circuit held that the two challenged portions of the Final Rule were an improper expansion of the ATF's statutory authority, vacated the District Court's vacatur order, and remanded the case back to the District Court for further consideration of the remedy. *VanDerStok v. Garland*, 86 F.4th 179, 196–97 (5th Cir. 2023).[4]

On August 8, 2023, the U.S. Supreme Court stayed the District Court's June 30, 2023, order and July 5, 2023, judgment. On April 22, 2024, the U.S. Supreme Court granted the Government's petition for a writ of certiorari. *Garland v. VanDerStok*, No. 23-852, 2024 WL 1706014 (U.S. Apr. 22, 2024). As of the writing of this Order, the ATF's Final Rule is enforced and requires, inter alia, that firearm parts (i.e., frames or receivers) sold by manufacturers of firearm parts kits have serial numbers. *See* 87 Fed. Reg. at 24654 ("The rule requires persons who engage in the business of dealing in weapon and frame or receiver parts kits defined as firearms to

---

[4] The Court notes that this regulation is being challenged under the Administrative Procedures Act rather than the Second Amendment.

be licensed, mark the frames or receivers within such kits with serial numbers and other marks of identification, and maintain records of their acquisition and disposition.").

## II.  FINDINGS OF FACT

The Court heard testimony from the following Plaintiffs during the Evidentiary Hearing on March 14, 2024:  Christopher Richardson, Max Schlosser, and John Howard.[5]  The Court also heard expert testimony, for Defendant, from Brian DeLay, Ph.D., an Associate Professor of History and the Preston Hotchkis Chair in the History of the United States at the University of California, Berkeley (D. 23-1 at 3).  Finally, the Court reviewed the Declaration of Joseph Greenlee (D. 26-1)[6] and the Declaration of Brian Delay (D. 23-1).

Plaintiff Richardson is a member of Rocky Mountain Gun Owners (RMGO) and the National Association for Gun Rights (NAGR) (D. 8-4 at 1).  Plaintiff Richardson has purchased three 80 percent frames from Polymer80, Inc. (Polymer80),[7] assembled one into a PMF, and wishes to continue to do so without serializing the PMFs (D. 28 at 26).  Plaintiff Richardson testified that he chose not to undergo the serialization process, destroyed his PMF, and removed his two remaining firearm parts kits to another state (*id.* at 27-28).  Plaintiff Richardson testified that he owns approximately ten other firearms with serial numbers, passed a background check for two firearm purchases, and that there is no difference in the operability of a firearm regardless of

---

[5] The Court also heard testimony from Taylor Rhodes, a representative of Rocky Mountain Gun Owners (RMGO), and Dudley Brown, a representative of the National Association for Gun Rights (NAGR) (*see* D. 28).  The Court did not give much weight to their testimony as they merely testified as to the interests of their respective organization.

[6] Defendant did not object to this declaration being attached in Plaintiffs' Reply.  Plaintiffs did not have Mr. Greenlee testify as an expert witness during the Evidentiary Hearing.

[7] Polymer80 is a company that manufactures kits with components that are technically inoperable until assembled by the individual into a PMF.  Based on the testimony of the Plaintiffs, Polymer80 no longer sells unserialized parts kits due to the enforcement of the ATF's Final Rule.  All Plaintiffs testified that they purchased their kits from Polymer80 and not from other manufacturers of frame or receiver parts kits (e.g., JSD Supply and 80 Percent Arms).

whether it possesses a serial number (*id*. at 32). Plaintiff Richardson did not testify that he *currently* had the capabilities to 3D print or that he had 3D-printed frames or receivers in the past. Rather, he testified that "absent this statute, [he] would have noncriminalized access to that" (*id*. at 34). The Court further inquired:

> THE COURT: Would it be possible, before it becomes a receiver, to take that piece of plastic in, assuming you wanted to, and get a serial number affixed to it?
>
> THE WITNESS: I do not personally know of any print files that have accommodations for serial plates, which are typically required to be metal. And so I'm not sure that I have the necessary expertise or knowledge to answer that.

(*Id*. at 34-35). Plaintiff Richardson has not 3D printed firearm components and it does not appear to the Court that he has the knowledge or experience to 3D print firearm components, especially frames or receivers, in order to assemble a PMF (*id*. at 35). On redirect examination, Plaintiff Richardson answered in the affirmative when asked if he had "the capability to 3D print firearms or firearm parts." Plaintiffs' counsel did not clarify for the Court what "capability to 3D print" entailed (i.e., whether this capability pertained to the ability to purchase a 3D printer at a future date, whether Plaintiff Richardson already owned or had access to a 3D printer, or even whether he had the capabilities to purchase or create digital 3D models of firearms in order to 3D print frames or receivers).

Plaintiff Schlosser is a member of RMGO and the NAGR as well as a federal firearms licensee (FFL) holder and runs a firearms business, Skyline Distributions, full-time (*id.* at 7, 14). Plaintiff Schlosser testified that he has purchased multiple products from Polymer80, in particular, "80 percent lowers that were constructed into Glock-pattern firearms" (*id.* at 10). Plaintiff Schlosser testified that he destroyed the Glock-pattern PMFs and his unfinished, unserialized

frames or receivers rather than serialize them (*id*. at 11-12).  Plaintiff Schlosser testified that he

had not sought to obtain the FFL license that would authorize him to serialize his PMFs and opted

to destroy his PMFs and unfinished kits rather than obtain serialization from another FFL (*id*. at

15).

Plaintiff Howard is a member of both the NAGR and RMGO (D. 8-2 at 1).  Within the last

two years, he has purchased five parts kits from Polymer80, has assembled two PMFs from those

kits (specifically, a Glock 17 pattern frame into a pistol and an AR-15 lower receiver into an AR-

15 rifle), and opted to have his PMFs serialized[8] (D. 28 at 38-39).  Plaintiff Howard testified that

following the enactment of § 18-12-111.5, he paid a $50 fee per PMF or parts kit for serialization

from an FFL but would not have done so if not required by statute (*id*. at 43).  Plaintiff Howard

testified that the serialization does not affect the operability of the PMF (*id*. at 44).

### III.  LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy, the exception rather than the rule"

and should be "granted only in cases where the necessity for it is clearly established."  *U.S. ex rel.*

*Citizen Band Potawatomi Indian Tribe of Oklahoma v. Enter. Mgmt. Consultants, Inc.*, 883 F.2d

886, 888 (10th Cir. 1989) (internal quotations and citations omitted).   "The purpose of a

preliminary injunction is not to remedy past harm but to protect plaintiffs from irreparable injury

that will surely result without their issuance."  *Schrier v. Univ. Of Co.*, 427 F.3d 1253, 1267 (10th

Cir. 2005).  To prevail on a motion for a preliminary injunction, the movant must prove: (1) a

substantial likelihood of prevailing on the merits; (2) irreparable injury unless the injunction is

---

[8] Plaintiff Howard testified that one kit was assembled but the PMF was damaged and unusable and cannot be "converted into a firearm" while the other two kits were not completed.

issued; (3) that the threatened injury (without the injunction) outweighs the harm that the preliminary injunction may cause the opposing party; and (4) that the injunction will not adversely affect the public interest. *Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 797 (10th Cir. 2019) (internal quotations and citation omitted). "An injunction can issue only if each factor is established." *Denver Homeless Out Loud v. Denver, Colorado*, 32 F.4th 1259, 1277 (10th Cir. 2022) (citation omitted). The final two preliminary injunction factors merge when the Government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The Tenth Circuit's definition of "probability of success" is liberal, especially where "the moving party has established that the three 'harm' factors tip decidedly in its favor." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003).

Because a preliminary injunction is an extraordinary remedy, the plaintiff's right to relief must be clear and unequivocal. *Schrier*, 427 F.3d at 1258 (citation omitted). The Tenth Circuit specifically disfavors injunctions that will (1) alter the status quo, (2) mandate an affirmative act by the defendant, or (3) afford the movant all the relief that he could recover at the conclusion of a full trial on the merits. *Id*. at 1259. Here, Plaintiffs' motion falls into the third category.

## III.  ANALYSIS

### A.  Standing[9]

Defendant argues that the Individual Plaintiffs lack Article III standing because (1) the Statute only requires that Plaintiffs obtain a serialization from an FFL and (2) NAGR and RMGO

---

[9] Defendant has agreed to waive sovereign immunity and consents to be sued in this Court solely in this case, only in his official capacity as Governor, and only for prospective relief (D. 23 at 3). Regardless, as discussed below, Plaintiffs can only establish standing and subject matter jurisdiction for a limited number of claims for prospective relief and retrospective relief. As the Court finds no basis for retrospective relief, it is unnecessary to address the prospective only nature of Governor Polis' waiver of immunity.

lack standing because they only assert standing based on the interests of their members (D. 23 at 5-6).  Plaintiffs argue that they do have standing because "but for the statute" each Individual Plaintiff would "continue purchasing firearms parts kits and assembling them into firearms" (D. 26 at 4).  Both parties' briefing and oral arguments regarding standing could have been more robust. Indeed, neither side addressed the issue of standing as it relates to the prohibition on 3D printing. Nevertheless, Plaintiffs bear the burden of establishing standing.  *Colorado Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 544 (10th Cir. 2016).

"[A] court must raise the standing issue sua sponte, if necessary, in order to determine if it has jurisdiction."  *United States v. Colorado Supreme Ct.*, 87 F.3d 1161, 1166 (10th Cir. 1996). "A federal court is powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing."  *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1154 (10th Cir. 2005). Standing jurisprudence has two categories: (1) Article III (which enforces the case or controversy requirement of the United States Constitution) and (2) prudential (a "judicially self-imposed limit[] on the exercise of federal jurisdiction").  *Wilderness Soc'y. v. Kane Cnty.*, 632 F.3d 1162, 1168 (10th Cir. 2011).

Standing under Article III is a threshold issue that must be addressed before the putative plaintiff can litigate their claims in federal court.  *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 475–76 (1982).  To establish Article III standing, a plaintiff must allege that:

> (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).  At the preliminary injunction stage of the litigation, a plaintiff must make a "clear showing" that they have standing and are "entitled to such relief."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); s*ee also Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1185 (10th Cir. 2013) (Matheson, J., concurring).

### 1. Individual Standing

To the extent that an individual plaintiff is seeking prospective injunctive relief, the individual plaintiff "generally has standing if he or she alleges an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute, and there exists a credible threat of prosecution thereunder[,]" even if a plaintiff has not been prosecuted or threatened with prosecution.  *Ward v. Utah*, 321 F.3d 1263, 1267 (10th Cir. 2003) (internal quotations and citations omitted).  The threatened injury, however, must be a "real and immediate threat of being injured in the future[,]" which means it must be "certainly impending and not merely speculative."  *Tandy v. City of Wichita*, 380 F.3d 1277, 1283 (10th Cir. 2004).  An alleged injury that is "contingent upon speculation or conjecture is beyond the bounds of a federal court's jurisdiction."  *Id.* at 1283–84.  The Statute regulates three categories of conduct and Plaintiffs must have engaged in said conduct in order to challenge each component of the Statute. Therefore, standing for the Individual Plaintiffs in the instant case falls into three categories: (1) past purchases of frames or receivers to create a PMF; (2) future purchases of frames or receivers to create a PMF; and (3) 3D-printed frames or receivers to create a PMF.

>    *i.   Past purchases and PMFs assembled before January 1, 2024*

The Individual Plaintiffs' standing for past purchases of unfinished frame or receiver kits can be further categorized based on the actions they took before January 1, 2024, and the type of relief they seek: (1) retrospective relief or (2) prospective relief.  "The injury in fact requirement differs depending on whether the plaintiff seeks prospective or retrospective relief." *Colorado Cross Disability Coal. v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1211 (10th Cir. 2014) (internal quotations omitted).  "A plaintiff seeking retrospective relief . . . satisfies the 'injury in fact' requirement if she suffered a past injury that is concrete and particularized." *Tandy*, 380 F.3d at 1284.  "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief, however, if unaccompanied by any continuing, present adverse effects." *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974).  If a plaintiff presents evidence of a past injury to establish standing for retrospective relief, that plaintiff must also "demonstrate a continuing injury to establish standing for prospective relief."  *Jordan v. Sosa*, 654 F.3d 1012, 1019 (10th Cir. 2011).

Plaintiff Richardson purchased three unfinished frames from Polymer80, assembled one into a PMF, destroyed the PMF prior to January 1, 2024, and moved the remaining two unserialized firearm parts kits to another state before the Statute took effect (D. 28 at 26-28).  Plaintiff Richardson has standing to assert a claim for injunctive relief as he seeks prospective relief and meets the injury-in-fact requirement of Article III by (1) showing a continuing or imminent injury, (2) establishing a credible threat of prosecution should Plaintiff Richardson bring his two unserialized firearm parts kits back to Colorado, and (3) moving for a preliminary injunction on the day the Statute took effect.  *O'Shea*, 414 U.S. at 496; *Tandy*, 380 F.3d at 1283; *see also Peck*

*v. McCann*, 43 F.4th 1116, 1130 (10th Cir. 2022).  Indeed, enjoining the enforcement of § 18-12-111.5 would resolve Plaintiff Richardson's alleged injuries by removing the alleged violation of his Second Amendment rights.  *See, e.g., Aptive Env't, LLC v. Town of Castle Rock, Colorado*, 959 F.3d 961, 978 (10th Cir. 2020) ("While uncontested by Castle Rock, we also note that the plaintiff['s] injury . . . would be redressed by a judicial conclusion that the Ordinance['s Curfew] is unconstitutional." (alterations in original and internal quotation omitted)).  Specifically, his standing extends only to challenging one portion of the statutory regime at issue, which is the portion dealing with pre-January 1, 2024, purchases.

Plaintiff Schlosser and Howard only have standing to assert a claim for retrospective relief as they cannot show that there "exists a credible threat of prosecution thereunder."  *Aptive Env't, LLC*, 959 F.3d at 974.  Standing for retrospective relief may be based on past injuries but there is no claim for prospective relief if there is no present case or controversy regarding the injury.  *See PeTA, People for the Ethical Treatment of Animals v. Rasmussen*, 298 F.3d 1198, 1202 (10th Cir. 2002).  Plaintiff Schlosser testified that he purchased multiple products from Polymer80, destroyed his unserialized Glock-pattern PMFs prior to January 1, 2024, and destroyed his unfinished frames or receivers before the Statute took effect (*id*. at 10-12).  Plaintiff Howard testified that he paid for the serialization of his past five Polymer80 purchases before January 1, 2024 (*id* at 43-44).  While Plaintiffs Schlosser and Howard have standing to assert claims for retrospective relief and seek an award of damages or declaratory relief based on the actions they took to comply with the Statute, they may not base their claims for prospective relief on these past, alleged injuries.  *See Rasmussen*, 298 F.3d at 1203 n.2 (noting that only declaratory relief and monetary damages are available for past constitutional violations).

*ii.   Future purchases, current controversy, and ripeness*

Article III of the Constitution only permits a federal court to adjudicate actual cases and controversies; thus, issues pertaining to justiciability directly affect a federal court's subject matter jurisdiction. *United States v. Wilson*, 244 F.3d 1208, 1213-14 (10th Cir. 2001) ("Whether a claim is ripe for adjudication, and therefore presents a case or controversy, bears directly on this jurisdiction."). A justiciable controversy is defined as "definite and concrete, touching the legal relations of parties having adverse legal interests; and [must] be real and substantial and admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (citations and internal quotations omitted) (second alteration in original).

To determine whether a claim is ripe, the Court must evaluate two issues: "(1) the fitness of the issue for judicial resolution and (2) the hardship to the parties of withholding judicial consideration." *Wilson*, 244 F.3d at 1213. Plaintiffs acknowledged that the serialization requirement is currently regulated by the ATF's Final Rule. During cross-examination, Plaintiff Schlosser testified:

> Q. Okay. And that firearm -- those three firearms, none of them contained a serial number?
> A. No.
> Q. Do any of Polymer80's firearms parts kits, to your knowledge, contain serial numbers?
> A. Now they do.
> Q. Okay. If you obtained one of those kits that contains a serial number, is it your understanding that you cannot manufacture that firearm?
> A. If it has a serial number, it can be manufactured.
> Q. Okay. So you could get a kit with serialized parts and assemble a firearm from those parts?
> A. I could.

(D. 29 at 17-18).  As previously noted, the U.S. Supreme Court granted the Government's petition for a writ of certiorari and will hear oral argument on the ATF's Final Rule next term.  *See VanDerStok*, 2024 WL 1706014.  Currently, unfinished frames or receivers sold by manufacturers must be serialized per the ATF's presently enforced Final Rule.  The Court finds that Plaintiffs' argument, that § 18-12-111.5 unconstitutionally limits their future purchases of unserialized firearm parts kits in order to manufacture PMFs, is currently unripe as serialization currently is required under federal law.[10]  Because federal law sets the baseline requirements (i.e., currently requires manufacturers of firearm parts kits to serialize them before shipping to the customer), there is no active controversy regarding the serialization requirement under § 18-12-111.5; thus, the Court lacks subject matter jurisdiction to review Plaintiffs' challenge regarding the constitutionality of § 18-12-111.5 as it pertains to future purchases of firearm parts kits and serialization.[11]  Regardless of what Colorado law dictates, federal law precludes Plaintiffs from lawfully carrying out their intended activities.

Indeed, Plaintiffs' constitutional injury hinges on little more than speculation and contingency.  Ultimately, they have failed to establish that there is a "substantial controversy" that is ripe for adjudication regarding future purchases of firearm component kits that is "of sufficient

---

[10] The ATF's Final Rule, citing 18 U.S.C. § 927, notes that the Gun Control Act of 1968 (GCA) "does not preempt State or local law unless there is a direct and positive conflict with Federal law such that they cannot be reconciled or consistently stand together."  87 Fed. Reg. 24652 n.68.  The Court interprets this to mean that the GCA sets the baseline regulations and that a State may choose to enforce stricter, constitutionally valid regulations.  *See, e.g., Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 868 (2000) (noting that federal law creates a "floor" or minimum baseline for compliance by States and preemption principles apply only when state law conflicts).

[11] This would also seem to present a problem for Plaintiffs' claims from a redressability perspective. *See Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1158 (10th Cir. 2005) ("Article III further requires that the plaintiff demonstrate a substantial likelihood that the relief requested will redress its injury in fact . . .The plaintiff must show that a favorable judgment will relieve a discrete injury, although it need not relieve his or her every injury." (citations omitted)).  The Court, however, does not need to examine this issue.

immediacy and reality to warrant the issuance of a declaratory judgment" or injunctive relief.[12] *MedImmune, Inc.*, 549 U.S. at 127.  It is conceivable that, during the next term, the Supreme Court could determine that the ATF exceeded its congressionally delegated authority when promulgating its Final Rule and that it cannot require manufacturers of firearm parts kits to serialize them before shipping them to customers.  At that point, this controversy will be ripe for the Court to revisit.  As of now, however, the governing federal law renders this claim too speculative and unripe.  Ultimately, the Court will not review Plaintiffs' challenge to Colorado's PMF and firearm parts kits serialization requirement because the Supreme Court has stayed the Northern District of Texas's June 30, 2023, order and July 5, 2023, judgment, federal law currently requires serialization, and manufacturers of such firearm parts kits (e.g., Polymer80) currently do not sell unserialized firearm parts or kits.

### iii.   *PMFs and firearm parts via 3D printing*

Lastly, the Individual Plaintiffs failed to establish an injury-in-fact sufficient to establish Article III standing at the preliminary injunction stage as it pertains to 3D printing. Plaintiffs had the burden of establishing that they "have suffered an 'injury in fact'—an invasion of a judicially cognizable interest that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Dahlberg v. Avis Rent A Car Sys., Inc.*, 92 F. Supp. 2d 1091, 1110 (D. Colo. 2000).  For an asserted injury to be imminent as it pertains to the Second Amendment, "it must be real and immediate—not remote, speculative, conjectural, or hypothetical." *Brady Campaign to Prevent Gun Violence v. Brownback*, 110 F. Supp. 3d 1086, 1093 (D. Kan. 2015)

---

[12] Plaintiffs' briefing highlights that only if the Fifth Circuit's decision in *VanDerStok* is affirmed by the Supreme Court, can this Court proceed to examine the constitutionality of § 18-12-111.5.  Likewise, if the Supreme Court reverses the Fifth Circuit and holds that the ATF did not exceed the scope of its authority, then there is no active controversy.

(citation omitted).  Furthermore, a credible threat of prosecution cannot be based on "fears that are imaginary or speculative."  *Clark v. City of Shawnee, Kansas*, 228 F. Supp. 3d 1210, 1219 (D. Kan. 2017) (internal quotations and citation omitted).  The Supreme Court has made clear: "Allegations of possible future injury do not satisfy the requirements of Art. III. A threatened injury must be 'certainly impending' to constitute injury in fact."  *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990).

As previously described, none of the Individual Plaintiffs testified that they had access to a 3D printer, had attempted to 3D print a PMF prior to January 1, 2024, or had attempted to 3D print a PMF since the enactment of § 18-12-111.5 and have it serialized.  Only Plaintiff Richardson discussed 3D printing, but only hinted at his intent or capacity to 3D print a frame, receiver, or PMF in an evasive way: "Absent this statute, I would have noncriminalized access to that. Does that answer the question?" (D. 28 at 34).  Indeed, Plaintiff Richardson testified that he had never 3D printed any firearms or firearm parts before (*id*. at 35).  Merely having future access or capabilities to 3D printing is hypothetical and does not create an imminent injury that gives rise to Article III standing.  Accordingly, the Court finds that Plaintiffs do not have standing to challenge the constitutionality of § 18-12-111.5(5)(a)(I) as it pertains to manufacturing a PMF via 3D printing.

### 2.  *Organizational Standing*

The Court utilizes the same inquiry when analyzing an organization's standing under Article III.  *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982).  An organization can establish an injury in fact if there is a "concrete and demonstrable injury to the organization's activities . . . with the consequent drain on the organization's resources" that results in an

impairment to the organization's ability to fulfill an essential function, purpose, or goal. *Id.* at 379. An organization has standing to bring suit on behalf of its members "when its members would have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires individual members' participation in the lawsuit." *Friends of the Earth, Inc.*, 528 U.S. at 169.  In this instance, the organization must "identify members who have suffered the requisite harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009).

Similar to the above analysis regarding the Individual Plaintiffs, NAGR and RMGO only have associational standing to pursue injunctive relief for claims of constitutional infringement as it pertains to past purchases of unserialized, unfinished frames or receiver kits.[13] *Warth v. Seldin*, 422 U.S. 490, 515 (1975) ("If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured.").  Because there are no Individual Plaintiffs who have Article III standing for 3D-printed frames or receivers and PMFs, NAGR and RMGO similarly do not have Article III standing.[14]  Moreover, NAGR and RMGO do

---

[13] Nominal damages and retrospective declaratory judgment apply only to individual claims alone and are not a form of relief that extends standing to an association.  Moreover, NAGR and RMGO neither allege any monetary injury to itself nor any assignment of damages claims of its members.  *Am. Humanist Ass'n, Inc. v. Douglas Cnty. Sch. Dist. RE-1*, 328 F. Supp. 3d 1203, 1214 (D. Colo. 2018).

[14] Moreover, even if it is determined on appeal that NAGR and RMGO did have Article III standing to pursue a constitutional claim regarding the 3D printing of frames or receivers in order to manufacture a PMF, the Court would still find that the organizations lack prudential standing and only raise generalized grievances.  *See United States v. Windsor*, 570 U.S. 744, 745 (2013) ("Unlike Article III requirements—which must be satisfied by the parties before judicial consideration is appropriate—prudential factors that counsel against hearing this case are subject to countervailing considerations [that] may outweigh the concerns underlying the usual reluctance to exert judicial power.") (internal quotation and citation omitted); *Hill v. Warsewa*, 947 F.3d 1305, 1309–10 (10th Cir. 2020) ("Under the prudential standing doctrine, a party may not rest its claims on the rights of third parties where it cannot assert a valid right to relief of its own." (internal quotation and citation omitted)).

not claim that § 18-12-111.5 makes it difficult or impossible for them to fulfill any of their essential goals or purposes; thus, NAGR and RMGO do not have standing in their own right. *Havens Realty Corp.*, 455 U.S. at 379.

### B. Preliminary Injunction[15]

Plaintiffs move to enjoin § 18-12-111.5, arguing that gunsmithing was a "universal need in early America" and that many individuals were "engaged in gunsmithing as an additional occupation or hobby" (D. 8 at 1). Plaintiffs argue that "the conduct of making and possessing PMFs is covered by the plain text of the Second Amendment" and that "the Statute's prohibition of that conduct is not consistent with this Nation's history and tradition of firearms regulations" (*id.* at 3). Defendant counters that "[t]he use of these untraceable 'ghost guns' in crimes has spiked in recent years, creating challenges for law enforcement and undermining public safety," that § 18-12-111.5 does not violate the Second Amendment as it merely requires anyone possessing an unserialized firearm frame or receiver to obtain serialization, and that the Statute is consistent with the nation's history and tradition of regulating self-made firearms and components (D. 23 at 1-2).

The Second Amendment of the United States Constitution states "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. II. In 2022, the Supreme Court held that the Second and

---

[15] Because the Court finds that Plaintiffs do not have standing for claims regarding 3D-printed frames or receivers, Plaintiffs' claims regarding Colorado's requirement for serialization of future purchases are unripe, and the proscribed conduct as it pertains to past purchases is not covered by the plain text of the Second Amendment, the Court does not need to analyze the severability of § 18-12-111.5. Colo. Rev. Stat. § 2-4-204; *see I.N.S. v. Chadha*, 462 U.S. 919, 934 (1983). Furthermore, Plaintiffs moved in their Reply to strike the Declaration of Dr. Webster (D. 26 at 2-3). The Court took this motion under advisement during the Evidentiary Hearing (D. 28 at 5). As will be addressed in detail infra, because the Court finds that the Second Amendment's plain text does not cover an individual's conduct regarding possession of unserialized frames or receivers and PMFs from prior purchases, the Court does not need to analyze Plaintiffs' motion to strike Dr. Webster's statements.

Fourteenth Amendments protect the right of law-abiding citizens to carry a handgun for self-defense outside of the home. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 9 (2022). This judgment is consistent with the holdings in *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), and these cases remain binding precedent. *Id.* "The Second Amendment right is fully applicable to the States" and "the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right recognized in *Heller*." *McDonald*, 561 U.S. at 750, 791.

In *Bruen*, Justice Thomas—writing for the majority—held that:

> [W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

597 U.S. at 17. While the Supreme Court declined to adopt the two-part analysis that most U.S. Courts of Appeals had utilized when analyzing Second Amendment challenges, such a test requires this Court to examine multiple facets of this "one-step" test.[16] *See United States v. Avila*, 672 F. Supp. 3d 1137, 1143 (D. Colo. 2023) ("The Court has carefully read *Bruen* and is sensitive to its admonition that lower courts apply a one-step test. Nonetheless, the opinion's logic is difficult to

---

[16] The Court considers this statement regarding the number of steps to be dicta, which ultimately does not alter the analysis that is required under *Bruen*. For purposes of this case, whether *Bruen*'s rejection of the traditional two-step framework leaves lower courts with a one-part or a multi-part test is irrelevant. The *Bruen* one-step analysis is triggered by a single event, which begins only when the Second Amendment is actually implicated. Just as driving a car could be described as a singular act even though it requires multiple discrete actions, it still requires the ignition of the engine. Here, because the Second Amendment is not implicated, there is no ignition, and the engine is not running. Thus, there is no need for a full *Bruen* analysis, which would include an examination of the Nation's historical tradition of firearm regulation.

collapse into just one step . . . *Bruen*'s directive is best understood as one to eschew means-end analysis in favor of text, history, and tradition.").

Regardless, consistent with the textual analysis conducted by the Supreme Court, this Court must ultimately examine: (1) whether the petitioner is part of "the people" who are protected by the Second Amendment; (2) whether the device (a handgun in *Bruen*) is a firearm that is a weapon in common use today for self-defense; and (3) whether the plain text of the Second Amendment protects the petitioner's proposed course of conduct. *Bruen*, 597 U.S. at 32. For purposes of this Order, the Court will assume without deciding that (1) Plaintiffs are people protected by the Second Amendment and (2) a PMF that is constructed from a purchased frame or receiver from a licensed manufacturer, and without a serial number, is a firearm that is a weapon in common use today for self-defense.[17]

The crux of the instant dispute is whether the plain text of the Second Amendment covers Plaintiffs' proposed conduct. Plaintiffs' argument is as multi-faceted as *Bruen*'s one-step test: (1) "[t]he right to keep and bear arms implies a corresponding right to acquire arms"; thus, (2) Plaintiffs have the right to manufacture arms privately; ergo, (3) the Statute's requirement that Plaintiffs serialize unfinished frames or receivers purchased from a licensed firearms manufacturer infringes upon their Second Amendment rights (D. 26 at 5-7).[18] Defendant argues that the individual's right to keep firearms is unimpeded because:

---

[17] The Court does not need to reach the question of whether an unfinished frame or receiver kit constitutes a firearm as Plaintiffs are not successful in establishing that the Second Amendment covers their proposed conduct. Furthermore, *Bruen* does not dictate any particular order in which the Court should conduct its analysis when examining these facets under the "one-step" test.

[18] Plaintiffs allege that "[o]n its face, C.R.S. § 18-12-111.5(5)(a)(I) makes it illegal for anyone who is not a federally licensed firearms manufacturer to make a firearm – period full stop" (D. 26 at 7). Plaintiffs attempt to argue that the Statute prevents any and all manufacturing of PMFs, including assembling unfinished frame or receiver kits, "even if

> [t]he statute does not prohibit Plaintiffs from possessing any particular arm or category of arms. Instead, the statute simply requires that, if an individual possesses a firearm or firearm component without a serialized number, then they must get a serialization affixed.

(D. 23 at 7).  Despite the evolution of the Supreme Court's Second Amendment jurisprudence, the Supreme Court (either in majority holdings or by the individual justices) has consistently reaffirmed that there are constitutional limitations to the Second Amendment.  In *Bruen*, Justice Alito wrote in his concurrence:

> Our holding decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun. Nor does it decide anything about the kinds of weapons that people may possess. Nor have we disturbed anything that we said in *Heller* or *McDonald* . . . about restrictions that may be imposed on the possession or carrying of guns.

---

the person intends to have the firearm stamped with a serial number" (*id.*). This argument is unavailing.  Section 18-12-111.5(1)(a) denotes that "[a] person shall not knowingly possess or transport an unfinished frame or receiver; except that it is not an offense if the unfinished frame or receiver is required by federal law to be imprinted with a serial number and has been imprinted with a serial number by a federal firearms licensee pursuant to federal law or subsection (7) of this section."  Separately, § 18-12-111.5(5)(a)(I) specifies that a "person shall not manufacture or cause to be manufactured, including through the use of a three-dimensional printer, a frame or receiver of a firearm." When the statute's text is unambiguous, the Court merely relies upon the text's plain meaning and the inquiry ends. *United States v. Broadway*, 1 F.4th 1206, 1211 (10th Cir. 2021) ("The plain meaning of a statute is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." (internal quotations and citation omitted)); *see also People v. Griego*, 409 P.3d 338, 342 (Colo. 2018) ("When the statutory language is clear, we apply the plain and ordinary meaning of the provision . . . In doing so, we give consistent, harmonious, and sensible effect to each part of the statute, and we interpret every word, rendering no words or phrases superfluous and construing undefined words and phrases according to their common usage.").

Examining § 18-12-111.5, it is clear from the plain text that the first four subsections pertain to the purchase and possession of an unfinished frame or receiver and the requirement to have it imprinted with a serial number pursuant to subsection (7).  Section 18-12-111.5(5)(a)(I)-(b)(I) prohibits a person who is not a federally licensed firearm manufacturer from manufacturing, including through the use of 3D printing, a frame or receiver and requires that an individual who owns such a manufactured firearm on or before June 2, 2023, to have it serialized by an FFL on or by January 1, 2024.  A plain reading of the text indicates that subsection (5) prohibits 3D printing of frames and receivers but leaves open the possibility of including other forms of production or technologies capable of replication.  *See Manufacture*, Black's Law Dictionary (11th ed. 2019) (Defined as "any material form produced by a machine from an unshaped composition of matter").  The Court does not find that § 18-12-111.5(5) operates to ban the assembly of purchased, serialized unfinished frames or receivers into a PMF.  Regardless, Plaintiffs do not have standing to challenge this portion of the Statute as none of the Plaintiffs established that they were capable of manufacturing their own frame or receiver.

142 S. Ct. at 2157 (Alito, J., concurring); *see also Vincent v. Garland*, 80 F.4th 1197, 1201 (10th Cir. 2023) ("[S]ix of the nine Justices pointed out that *Bruen* was not casting any doubt on this language in *Heller*.").

Thus, this Court relies upon *Heller* to analyze the instant case.  In *Heller*, the Supreme Court noted:

> Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose . . . Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, *or laws imposing conditions and qualifications on the commercial sale of arms*.

554 U.S. at 626–27 (emphasis added); *see also McDonald*, 561 U.S. at 786 ("We repeat those assurances here. Despite municipal respondents' doomsday proclamations, incorporation does not imperil every law regulating firearms.").[19]

Justice Kavanaugh clarified in *Bruen* that "the Court's decision does not affect the existing licensing regimes—known as 'shall-issue' regimes" and that these regimes "may require a license applicant to undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements."  597 U.S. at 79-80 (Kavanaugh, J., concurring).  As long as these regimes "do not

---

[19] William Blackstone, oft-cited for the principle that gun ownership is a fundamental right, also noted that this right to keep arms was not unfettered and that regulations could also be placed upon such ownership and possession:  "[t]he fifth and last auxiliary right of the subject . . . is that of having arms for their defence *suitable to their condition and degree, and such as are allowed by law* . . . ."  2 William Blackstone, Commentaries *143-44 (emphasis added).

grant open-ended discretion to licensing officials and do not require a showing of some special need apart from self-defense" they are constitutionally permissible. *Id*. More recently, the U.S. Court of Appeals for the Tenth Circuit confirmed that *Bruen* did not indisputably and pellucidly abrogate *Heller* and preserved the "shall-issue" regimes and related background checks. *Vincent*, 80 F.4th at 1202 (holding that a federal ban on possession of a firearm by a felon under 18 U.S.C. § 922(g)(1) was constitutional under *Heller*).

The Court finds that § 18-12-111.5—as it pertains to prior purchases for unserialized frames or receivers—imposes a condition on the commercial sale of a firearm, which was recognized as constitutional in *Heller* and that was not abrogated or called into question in any way in *Bruen*. Section 18-12-111.5 does not prevent an individual from buying an unfinished frame or receiver or firearms part kit and in no way infringes upon Plaintiffs' right to acquire arms. Rather, the Statute requires the purchaser to have the frame or receiver serialized by an FFL and to undergo a background check. *See also Avila*, 672 F. Supp. 3d at 1143 ("Fixing a serial number on a firearm has no impact on its operation."). Thus, the Statute is presumptively constitutional under *Heller* and Plaintiffs have failed to establish that the plain text of the Second Amendment extends to the Individual Plaintiffs' intended conduct (i.e., possession of unserialized frames or receivers[20] and PMFs after January 1, 2024). Accordingly, Plaintiffs cannot succeed on the merits of their claim regarding prior purchases and the Court must deny Plaintiffs' motion for injunctive

---

[20] Curiously, the Northern District of Texas concluded that the firearm parts kits containing frames or receivers did not constitute a firearm under 18 U.S.C. § 921. *See VanDerStok*, 625 F. Supp. 3d at 579-82. Thus, there is a conceivable argument that firearm parts kits and unfinished frames or receivers are not protected under the Second Amendment on the basis that they are not arms; however, because the Supreme Court has stayed this judgment the Court does not need to analyze this issue.

relief.  Similarly, because the Court finds that the Statute's serialization requirement for past purchases is presumptively lawful, Plaintiffs cannot seek retrospective relief either.[21]

### IV.  CONCLUSION

Accordingly, Plaintiffs' Motion for Temporary Injunction is DENIED (D. 8).


DATED May 2, 2024.

BY THE COURT:

_____
Gordon P. Gallagher
United States District Judge

---

[21] Since the Court finds that the serialization requirement for previously purchased unfinished frames or receivers is presumptively lawful under *Heller*, the Court declines to examine the separate issue of whether such a requirement is in accord with the Nation's history and tradition of regulating firearms.  The Court thanks Dr. DeLay for his expert testimony on the history of firearm regulations in America and found his knowledge of the subject matter compelling.